1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NIKKI RUSSELL, | ) 1:05-cv-01382 JMD |
| | ) |
| | ) |
| Plaintiff, | ) ORDER REGARDING PLAINTIFF'S |
| | ) SOCIAL SECURITY COMPLAINT |
| v. | ) |
| | ) |
| MICHAEL J. ASTRUE, Commissioner | ) |
| of Social Security, | ) |
| | ) |
| | ) |
| Defendant. | ) |
| | ) |

## **BACKGROUND**

Plaintiff Nikki Russell ("Plaintiff") seeks judicial review of a final decision of the

Commissioner of Social Security ("Commissioner") denying her application for supplemental

security income ("SSI") and disability insurance benefits pursuant to Title XVI and Title II of the

Social Security Act. The matter is currently before the Court on the parties' briefs, which were

submitted, without oral argument, to the Honorable John M. Dixon, Jr., United States Magistrate

Judge.[1]

---

[1]The parties consented to the jurisdiction of the United States Magistrate Judge.  On March 16, 2006, the
Honorable Anthony W. Ishii assigned the case to Magistrate Judge Sandra M. Snyder.  On August 10, 2007, the
Honorable Garland E. Burrell, Jr., reassigned the case to the undersigned for all purposes.

1    **FACTS AND PRIOR PROCEEDINGS**[2]

2    On June 19, 2002, Plaintiff filed an application for SSI.  AR 269-272.  On June 27, 2002,

3    Plaintiff filed a subsequent application for disability insurance benefits.  AR 96-99.  Plaintiff

4    alleged disability since November 3, 1997, due to depression, panic attacks, social anxiety,

5    generalized anxiety and carpal tunnel syndrome.  AR 96, 269.  After being denied both initially

6    and upon reconsideration, Plaintiff requested a hearing before an Administrative Law Judge

7    ("ALJ").  AR 68-71, 73-77, 78.  On October 29, 2003, ALJ Rocklin D. Lyons held a hearing.

8    AR 281-301.  ALJ Lyons denied benefits on June 2, 2004.  AR 55-67.  Plaintiff filed a second

9    application for SSI on June 16, 2004.  AR 275-278.  Thereafter, on July 16, 2004, the Appeals

10   Council granted Plaintiff's request for review regarding her first application and remanded the

11   case to an ALJ.  AR 87, 88-89.

12   On April 14, 2005, ALJ James E. Ross held a hearing.  AR 302-322.  ALJ Ross denied

13   benefits on June 27, 2005.  AR 12-23.  On August 19, 2005, the Appeals Council denied

14   Plaintiff's request for review.  AR 7-10.

15   Hearing Testimony

16   *October 29, 2003*

17   The first hearing convened in Bakersfield, California on October 29, 2003, before ALJ

18   Lyons.  AR 281, 283.  Plaintiff appeared with her attorney, Mr. Hayden.  AR 283.

19   At the time of the hearing, Plaintiff was 31 years old with a twelfth grade education.  AR

20   284.  She did not complete a high school GED.  AR 284.  She has not attended any formal

21   vocational training.  AR 284.

22   Plaintiff is married.  AR 285.  She has six children, who were 15, 10, 9, 7, 5 and 2 at the

23   time of the hearing.  AR 284-285.  Her husband works at Sparkle Cleaners' main plant.  AR 285.

24   She does not have a driver's license.  AR 285.  It is suspended, but she does not remember why.

25   AR 285.

26

27

28   _____

[2] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

Plaintiff testified that she worked as a cashier in 2000 and early 2001. AR 286. She last worked at that job around March or April. AR 286. She left that job due to health issues. AR 286. She also worked at Today's Cleaners for about 20 days in August of 2003, but her health issues "had [her] stop." AR 286.

Plaintiff testified that she has not been hospitalized for heart problems or any other problems since March of 2001. AR 286. She is taking medications for her heart. AR 287. She was diagnosed with heart problems about 6 years ago. AR 287. She is not seeing any psychiatrist, psychologist or mental health professionals. AR 287. Her doctor, Dr. de Barros,[3] was going to refer her to mental health. AR 287. He prescribes her medication. AR 287. She had an evaluation done through the Human Services Department, which referred her to mental health. AR 287. She saw mental health briefly and they wanted her to do different classes. AR 287. She did not have adequate transportation, so she did not go. AR 287. Her husband owns a car now, but at the time of the appointments they did not. AR 287.

Plaintiff is being treated for back problems. AR 287. She had x-rays done and was referred to a physical therapist. AR 287. She is scheduled for her first appointment. AR 288.

Plaintiff's primary doctor is Regis M. de Barros, M.D., and her cardiologist is Dr. Peter Nalos. AR 288. She has been seeing Dr. de Barros for over a year. AR 288. She has been taking her prescriptions as given by the doctor. AR 288.

Plaintiff testified that she has palpitations as a result of her heart difficulty. AR 288. She is on medication. AR 288. Her palpitations used to come "every so often," but then she had "a real bad anxiety attack" in June 2002 and they never stopped. AR 288. Every other heartbeat "was just a palpitations." AR 288. He put her on "Flecainide" which helps. AR 288. She takes it twice a day. AR 288. Since she has been on the medication, the palpitations have been controlled. AR 288. She still has them, "but not consecutively, just back to back." AR 288.

Plaintiff testified that she always is having chest pains. AR 289. They have not found out if that is related to her heart or is an inflammation in her chest. AR 289. She is on

---

[3]The transcript identifies this provider as "Dr. Debarlios." AR 287. The medical records identify Plaintiff's provider as "Regis M. de Barros, MD." AR 188. For ease of understanding, the Court will refer to this provider as "Regis M. de Barros, M.D." or "Dr. de Barros."

medication for that, too.  AR 289.  She has 12 prescription refills, so she is expected to stay on the medication for at least a year or more.  AR 289.  She already has been on it for over 6 months.  AR 289.

Plaintiff testified that she has anxiety.  AR 289.  When she has anxiety, she starts sweating, she cannot breathe, or she is "real, real nervous."  AR 289.  She stays anxious "a lot" and it is "hard to function a lot...around a lot, lot of people."  AR 289.  She has a lot of people in her home.  AR 289.

Plaintiff testified that her husband works full time.  AR 289.  Her niece, who was 19 at the time of the hearing, lives with her full time.  AR 290.  She has lived there since July of 2002.  AR 290.  Plaintiff does the cooking, but not housework.  AR 290.  She cleans her room and her bathroom.  AR 290.  She does not have a washing machine in her house.  AR 290.  She washes dishes.  AR 290.  Her daughter, her niece and her husband wash the clothes.  AR 291.  Plaintiff helps fold clothes, but she does not carry them back and forth to the laundry room.  AR 291.  She does not go to the laundry room.  AR 291.

Plaintiff testified that she does not attend activities at her children's schools because they do not have activities.  AR 291.  The children switched to different schools and have not had a parent conference meeting.  AR 291.  She has not been to a parent conference meeting.  AR 291.  She does not go.  AR 292.  She does not attend church or any other social activities.  AR 292.

Plaintiff testified that she takes four to five different medications for her anxiety.  AR 292.  She is on medication to help her sleep and for anxiety or panic attacks that happen right then.  AR 292.  Paxil is something she takes to try to control it.  AR 292.  She takes about eight different medications, and that is what is keeping her "so down and so under."  AR 292.  Most of the medications "have side effects which are drowsiness, which keeps [her] from doing a lot besides laying [sic] down."  AR 292.

Plaintiff testified that after she had her son, which was 2 years before the hearing, she had Bell's Palsy.  AR 292.  It has not gone away completely.  AR 292.  She never found out what was wrong.  AR 292.  She has migraines from the back of her head, her eyes still jerk and she has trouble eating and drinking without a straw.  AR 292.

In response to questions from her attorney, Plaintiff testified that she has trouble with her wrists. AR 292. She has "carpal." AR 293. She was wearing a brace. AR 293. She has trouble carrying the laundry because it is heavy and she does not really go outside. AR 293. She does not do a lot of socializing. AR 293. She stays in a complex that has 200 apartments and she does not go outside. AR 293.

Plaintiff testified that her medications cause her drowsiness, sluggishness, loss of appetite and diarrhea. AR 293. She lies down during the day. AR 294.

She has carpal tunnel in both wrists, but it is worse in the left wrist. AR 293. She is right-handed. AR 293. She was diagnosed with carpal tunnel when she was pregnant. AR 294. They splinted her wrist at Urgent Care. AR 294.

Plaintiff testified that she has had a C-Section, gall stones and her left ovary removed. AR 295. The heaviest thing she lifts and carries is her iron, which is under 10 pounds. AR 295. She does not do a lot of lifting. AR 295. She can walk about two blocks before she needs to stop. AR 295. She has not had to walk anywhere. AR 295. She can stand about 30 or 45 minutes before she needs to sit. AR 295. She can sit about an hour and a half before she feels she needs to stand. AR 295. She has a lot of discomfort in her back. AR 295. She cannot kneel, stoop or squat to the ground without a problem. AR 296.

A normal day for her is to just sit home. AR 296. She gets up when everybody gets up. AR 296. She usually wakes up because she has a lot of trouble sleeping. AR 296. She does not know why she has problems sleeping. AR 296. She wakes up all through the night. AR 296.

Plaintiff testified that she does not have any problem dressing, cleaning herself, putting on her shoes or taking a shower. AR 296. She has trouble grabbing with her hands. AR 296. She has a lot of numbness in her hand and her legs that is mainly on the left side. AR 296. She does not do anything for exercise. AR 296.

Plaintiff started seeing Dr. de Barros more than a year ago. AR 297. After she fell, she started to see him about her back. AR 297.

Plaintiff testified that she has problems with her eyes. AR 297. She has blurred vision in her left eye. AR 297. Bell's palsy affected her vision. AR 297. She has "like blurred spots"

1  sometimes.  AR 297.  One eye "swelled for over four months never shut."  AR 297.  They gave

2  her patches and cream.  AR 297.  She was supposed to wear the patch to keep it from drying out.

3  AR 297.  After she started getting feeling back in her face, it is "like slower than the average

4  eye."  AR 297.  When she goes to drink or open her mouth, the eye just shuts, which is why she

5  usually drinks out of a straw.  AR 297.

6       Plaintiff felt that anxiety disorder and severe problems with her physical and emotional

7  health still applied.  AR 297.  She has anxiety attacks.  AR 297.  She gets short of breath.  AR

8  298.  She can "just break out in a sweat."  AR 298.  Her heart starts beating real fast.  AR 298.

9  She has felt like she was going to pass out.  AR 298.  She can "just get hot."  AR 298.  Those are

10  the things that were going on when she started working at her job in March.  AR 298.  She

11  already was in a high risk pregnancy.  AR 298.  She left her cashier job at Wal-Mart due to

12  anxiety attacks and the high risk pregnancy.  AR 298.  She thought that the anxiety attacks were

13  the cause of her leaving more than the high risk pregnancy.  AR 298.  She still gets anxiety

14  attacks, which depend on her mood, where she is and what she is doing.  AR 298.  She does not

15  like to travel.  AR 298.  She does not drive any more.  AR 298.  She will not get on the freeway.

16  AR 298.  A simple ride can cause an anxiety attack.  AR 298.  She will have anxiety attacks

17  about three or four times in a month.  AR 298.  With the medication, they can go away within 30

18  minutes, but she is "nothing" after the medication.  AR 298-299.  She is "almost in a zombie type

19  of mode."  AR 299.  If she is at a job, she cannot take that kind of medication because she would

20  not be able to function.  AR 299.

21       Plaintiff testified that the anxiety and mental problems have caused problems with her

22  concentration or memory.  AR 299.  It is hard to concentrate.  AR 299.  She can walk in the

23  kitchen and "forget what [she] even went in there for."  AR 299.  She forgets simple things like

24  phone numbers that she dials every day.  AR 299.  At one point in time, she was suicidal.  AR

25  299.  She has heard things that are not there.  AR 299.  She hears "like [her] door knobs click."

26  AR 299.  No doors are allowed to be "cracked" at her house--no closet doors.  AR 299.  She does

27  not like closet doors.  AR 299.  She usually sits all night in the dark with the door open, but not

28  with the lights on.  AR 299.  She has been like that for a long time.  AR 299.

1    She feels that people around her are out to get her all the time.  AR 299.  She has

2    problems with crying spells.  AR 299.  She feels like she got worse.  AR 299-300.  The first time

3    she went to mental health "they told [her] it would bypass maybe 6 months to year.  We're

4    looking at 7 years ago."  AR 300.  She did not go up to "Mary Kay Shell" or "Current Medical"

5    for mental health.  AR 300.  She went to mental health, but they required her to go to different

6    places all through the week.  AR 300.  She did not have the transportation and she does not catch

7    the bus.  AR 300.  She does not get out.  AR 300.  It would cause more of a panic attack to be out

8    and about.  AR 300.  If she realizes she does not have some kind of medication, then all of

9    sudden she needs that medication.  AR 300.  If she does not have her pump, she cannot breathe.

10   AR 300.  If she does not have her pain pills, it is "hurting her."  AR 300.  She is "just so

11   uncomfortable around people" that she chooses not to be around them.  AR 300.  She has been

12   around her children "all their life" so they would not cause her to have an anxiety attack.  AR

13   300.  They know what mood she is in and, when she has whatever attitude she has, they know to

14   go in a different direction or leave her alone in her own room.  AR 300.

15   *April 14, 2005*

16   Following the Appeals Council's remand, ALJ Ross held a video hearing on April 14,

17   2005, with the ALJ in Fresno, California and the Plaintiff in Bakersfield, California.  AR 15,

18   302-322.  Plaintiff appeared with her attorney, Geoffrey Hayden.  AR 304.  Vocational expert

19   ("VE") Cheryl Chandler also appeared at the Fresno site and testified.  AR 15, 305, 319.

20   Plaintiff was born on October 8, 1972.  AR 308.  She was 32 at the time of the hearing.

21   AR 308.  She can read and write.  AR 308.  She is 5'5" and weighs 198.  AR 308.  She does not

22   have a driver's license or drive a car.  AR 308.

23   Plaintiff last worked in August 2003.  AR 208.  She worked at Today's Cleaners "in-

24   taking information in the computer."  AR 308.  She did that job for 19 or 20 days.  AR 308.  In

25   2000, she worked at Wal-Mart as a cashier.  AR 309.  She stopped working there in April 2001.

26   AR 309.  She left for a lot of medical reasons, including high risk pregnancy and anxiety attacks.

27   AR 309.  They put her on medical leave temporarily but it continued through the pregnancy "and

28   probably months after the pregnancy."  AR 309.

1    Plaintiff testified about the major reasons that keep her from working.  AR 309.  She has

2  a lot of anxiety.  AR 309.  She has palpitations, carpal tunnel and chronic back problems.  AR

3  309.  She had two different back injuries.  AR 309.  The anxiety medication puts her in a state

4  where she "really can't do much of anything."  AR 309.  It makes her nauseated, dizzy,

5  lightheaded or sleepy.  AR 309.  She suffers from Bell's Palsy.  AR 309-310.  She also had a

6  recent left shoulder problem.  AR 310.  It "popped out of socket due to a fall."  AR 310.

7    Plaintiff's counsel read a list of Plaintiff's medications into the record as Lopressor,

8  Tambocor, Pepcid, Lorazepam, Paxil, Flexeril and Priloscec.  AR 310-311.

9    Plaintiff has carpal tunnel.  AR 311.  She has not had surgeries for it, but has had both her

10  wrists put in casts at Urgent Care.  AR 311.  She has trouble picking things up with her hands.

11  AR 311.  She has trouble with fine manual dexterity.  AR 311.  She has lots of cramping and

12  numbness in her fingertips.  AR 311.  She would have trouble picking up pennies off the table.

13  AR 311.

14    With her left shoulder problems, she has trouble lifting her arm or lifting it above her

15  head.  AR 311-312.  She does not lift or do too much lifting.  AR 312.  About the heaviest thing

16  she could lift is a five pound sack of potatoes.  AR 312.  She can walk about four or five blocks

17  before she feels she needs to stop.  AR 312.  She can stand about "30 minutes, an hour" before

18  she feels she needs to sit.  AR 312.  She can sit about two hours before she feels she needs to

19  stand.  AR 312.  She cannot kneel, stoop or squat to the ground without pain.  AR 312.

20    Plaintiff testified that she has trouble with headaches.  AR 312.  She gets them about

21  three or four times a month.  AR 312.  She did not know if it was from the Bell's Palsy, but she

22  has certain spots in her head that are still sore.  AR 312.  If she pushes a certain spot, it will jump

23  a nerve down to her nose to her lid to her eye.  AR 312.  When she goes to eat or drink, her left

24  eye shuts "automatically on its own."  AR 313.  It constantly waters and drains.  AR 313.  She

25  has the effects from the Bell's Palsy and paralysis in her face the last three years.  AR 313.

26    Plaintiff testified that the medications cause her side effects--a lot of nausea and

27  dizziness.  AR 313.  If she is having an anxiety attack and she takes her medicine, she is not

28

1    "able to keep functioning." AR 313.  She might just shut down, sleep hours.  AR 313.  She

2    cannot do anything.  AR 313.  She lies down a lot during the day.  AR 313.

3         Plaintiff testified that she lives with her husband and her six kids.  AR 313.  Her husband

4    works and two of her children receive Social Security.  AR 313.

5         Plaintiff testified that she does not sleep through the night.  AR 313.  She does not do

6    grocery shopping.  AR 313-314.  She usually makes a list out and either her sister or her daughter

7    do the majority of shopping.  AR 314.  The kids do the housework.  AR 314.  She can do little

8    things.  AR 314.  She has to take breaks between vacuuming or making up the bed.  AR 314.

9    Her sister comes over and helps wash the clothes and take care of the kids.  AR 314.  Her

10   daughter is 16 and a lot has been put on her to manage the household and to help out more than

11   the average teenage child.  AR 314.

12        On a normal day, Plaintiff gets up in the morning with her kids and helps them get

13   dressed.  AR 314.  She usually spends her day in the house.  AR 314.  She is very uncomfortable

14   out and about.  AR 314.  When she goes somewhere, she has to have all her medication or she

15   will get sick.  AR 314.  She will "get faint spells."  AR 314.  If she goes to the store, she is "in a

16   little hover around because sometimes during [her] encounter in the store" she gets dizzy.  AR

17   314.  She would rather stay home.  AR 314.  If they have company and too many people come

18   over, she usually just goes off to herself because it is too much.  AR 314.

19        Plaintiff testified that she has lost interest in "everything basically."  AR 314-315.  She

20   feels worthless.  AR 315.  She has a lot of problems with her concentration or memory.  AR 315.

21   She has crying spells.  AR 315.  She has felt that people are mad at her or out to get her.  AR

22   315.  She does not feel she is getting better.  AR 315.  She feels like she is getting worse.  AR

23   315.  The first time she went to mental health about seven years ago "the lady said it was just a

24   depressant stage and ... would probably be over within a year."  AR 315.  She is seeking mental

25   health help.  AR 315.  She is going to "Mary Kay Shell."  AR 316.  She has not started, but has

26   an appointment.  AR 316.  Her anxiety attacks are getting so bad that she went to the emergency

27   room in the past month for what she thought was a heart attack.  AR 316.  She was told it was

28   just a "stress reaction depression."  AR 316.

1    In response to questions from the ALJ, Plaintiff testified that she worked at Today's

2    Cleaners.  AR 316.  The corporate office is Richard K. Newman in Bakersfield, California.  AR

3    316.  She worked six days a week at two different locations.  AR 317.  She would go outside, get

4    dirty clothes, bring them in, sort them and put them into the computer.  AR 317.  When they were

5    finished, she would bag them and hang them.  AR 317.  When the customer came to pick them

6    up, she would deliver them to the car or at the register.  AR 317.  She stopped working because

7    she started having a lot of anxiety issues.  AR 317.  When she has an anxiety attack, she has

8    diarrhea and need to take breaks.  AR 317.  It was overwhelming and she quit.  AR 317.

9    Plaintiff testified that she has two children on SSI.  AR 317.  They each receive $694 or

10   $696 a month.  AR 318.  Plaintiff is not on SSI.  AR 318.  Her husband gets Aid for Dependent

11   Children, which totals $329.  AR 318.  The aid is in her husband's name.  AR 318.  He works for

12   the Richard K. Newman Company at Sparkle Cleaners.  AR 318.

13   Plaintiff testified that her low back problem started about three years ago.  AR 318.  She

14   started seeing Dr. de Barros[4] in 2003 and she is going to physical therapy for it.  AR 318.

15   Plaintiff testified that her license was suspended, but she does not recall when or why.

16   AR 319.  She has anxiety attacks when she drives, so she has not taken care of it.  AR 319.  She

17   does not drive.  AR 319.

18   The VE also testified in response to questions from Plaintiff's attorney.  AR 320.

19   Plaintiff's attorney asked the VE to assume a person with the same age, education and work

20   history as Plaintiff.  AR 320.  This person's ability to understand, remember and carry out

21   complex instructions is considered to be poor.  AR 320.  Her ability to understand and carry out

22   simple instructions is good.  AR 320.  Her ability to maintain attention, concentration and

23   persistence is marginal.  AR 320.  Her ability to perform activities withing a schedule and

24   maintain regular attendance is fair.  AR 320.  Her ability to complete a normal work day and

25   work week without interruptions from psychologically based symptoms is poor because of

26   avoidance, agitation and anxiety.  AR 320.  Her ability to respond to changes in the work setting

---

[4]The transcript identifies this provider as "Dr. Debarios."  AR 318.  As noted above, the Court will refer to this provider as "Regis M. de Barros, M.D." or "Dr. de Barros."

is considered to be marginal.  AR 320.  Her ability to manage her own finances is considered to be fair.  AR 320.  She also can sit two to four hours in an eight-hour day, can stand one hour and can walk one hour.  AR 320.  The VE testified that there are no jobs for an individual with those limitations.  AR 320.

Plaintiff testified that she has not been able to get in to seek mental health treatment.  AR 320.  She visited mental health in July of '02 through Cal Works, but she is no longer through Cal Works.  AR 321.  She has a MediCal card.  AR 321.

        Medical Evidence

On December 18, 1997, Plaintiff saw Dr. Kirit R. Desai, M.D., F.A.C.C., at the Central Cardiology Medical Clinic, because of recent episodes of palpitations.  AR 163-164.  Plaintiff reported an episode of palpitations and syncope in September 1997.  AR 163.  She also had two more episodes of palpitations that required going to the emergency room.  AR 163.  Plaintiff reported smoking about one half of a pack of cigarettes a day.  AR 163.  She was pregnant for the ninth time.  AR 163.  Dr. Desai's impression was palpitations, rule out cardiac dysrhythmias, and chest pain syndrome, rule out mitral valve prolapse.  AR 164.  Dr. Desai recommended a 24-hour Holter monitor and echocardiogram.  AR 164.  On December 18, 1997, Dr. Desai concluded that Plaintiff's 24-hour Holter monitor revealed the presence of PVCs that were not hemodynamically significant.  AR 162.

On December 24, 1997, Plaintiff underwent an echocardiogram.  AR 161.  Plaintiff's left ventricle and left atrium were normal.  AR 161.  Her aortic, mitral and tricuspid valves also were normal.  AR 161.  She had a trace of mitral regurgitation and a mild degree of tricuspid regurgitation.  AR 161.  No pericardial effusion was detected.  AR 161.

On January 6, 1998, Plaintiff saw Dr. Desai for a follow-up visit.  AR 160.  Plaintiff denied any complaints.  AR 160.  On physical examination, no cardiac gallops were noted, but she had a I/VI systolic murmur.  AR 160.  Dr. Desai diagnosed Plaintiff with premature ventricular contractions, which were not significant hemodynamically.  AR 160.  Dr. Desai advised Plaintiff that she did not require any therapy for the PVCs.  AR 160.

On July 18, 2000, Plaintiff underwent a 24-hour Holter monitor assessment. AR 180. Charles Tam, M.D., of Cardiovascular Consultants Medical Group, opined that Plaintiff's holter monitor showed occasional PVC's and appeared benign. AR 180.

On July 24, 2000, Dr. Tam completed a cardiovascular stress test of Plaintiff. AR 178. Plaintiff had symptoms of chest pain and dyspnea. AR 178. The study was considered negative for coronary insufficiency. AR 178.

On July 24, 2000, Dr. Tam also completed an echocardiogram of Plaintiff. AR 179. Dr. Tam opined that Plaintiff did not have hypertrophy, chamber enlargement or effusion. AR 179. She had normal valvular function and normal ventricular function at rest and after exercise. AR 179. The study was considered negative for coronary insufficiency. AR 179.

On June 4, 2001, Plaintiff underwent a 24-hour Holter monitor assessment. AR 177. Dr. Tam reported that Plaintiff's holter monitor was benign. AR 177.

On May 21, 2002, Plaintiff sought treatment from Regis M. de Barros, M.D., for complaints of chest pain at the right costochondral junction with palpation. AR 196. She was prescribed Tylenol for pain. AR 196.

On May 24, 2002, Plaintiff saw Dr. de Barros following a visit to the emergency room on May 23, 2002, for chest pain. AR 195. Plaintiff was prescribed Vioxx in the emergency room, but it was not covered by insurance. AR 195. Dr. de Barros prescribed Naprosyn. AR 195. Subsequent treatment notes indicated that Plaintiff's costochondritis was better with Naprosyn. AR 195.

On June 19, 2002, Plaintiff sought treatment at Clinica Sierra Vista. AR 186. She reported feeling anxious with palpitations, stress and insomnia. AR 186. The provider assessed Plaintiff to have situational anxiety with palpitations. AR 186. Her treatment plan included Paxil and Ativan. AR 186.

On July 3, 2002, Plaintiff sought treatment at Clinica Sierra Vista for frequent palpitations. AR 183. Charles Ike, PAC, referred Plaintiff to a cardiologist. AR 183. Plaintiff had an abnormal ECG. AR 182.

1    On July 5, 2002, Mary Kent, M.F.T., of the Kern County Mental Health System of Care

2 completed an assessment of Plaintiff.  AR 165-170.  Plaintiff also completed a substance abuse

3 screening.  AR 171-174.  Plaintiff complained to Therapist Kent of constant nervousness/worry

4 and panic attacks for approximately 5 months.  AR 165.  She reported leaving paid training

5 because the death of her friend's grandmother in the hospital where she worked (Code Blue

6 called) upset her.  AR 167.  She also indicated that she was good at managing money and always

7 would find odd jobs to keep her family fed.  AR 167.  On mental status exam, Plaintiff was

8 oriented with an euthymic mood and appropriate affect.  AR 168.  She had estimated below

9 average intelligence with fair insight and judgment.  AR 168.  Plaintiff reported being an

10 alcoholic but that she had stopped daily drinking.  AR 168.  She had relapsed 8 times in the prior

11 2 ½ years.  AR 168, 171.  Therapist Kent diagnosed Plaintiff with generalized anxiety disorder,

12 rule out alcohol abuse, and assigned her a Global Assessment of Functioning ("GAF") of 55.  AR

13 168.  Therapist Kent opined that Plaintiff had severe functional impairments of community

14 participation and physical and emotional health.  AR 168.  She had moderate limitations of

15 community living, community contribution, relationships with others and education and learning.

16 AR 168.  Plaintiff's treatment plan included reducing anxiety, attending a support group with

17 relapse prevention, attending a life skills class and medical checks.  AR 169.

18    On July 9, 2002, Dr. Tam completed an evaluation of Plaintiff.  AR 175-176.  Plaintiff

19 complained of problems with intermittent tachycardia and palpitations.  AR 175.  Plaintiff's

20 resting EKG was within normal limits with the exception of a short PR interval.  AR 176.  Dr.

21 Tam's impression was a history of tachycardia and palpitations suggesting intermittent

22 paroxysmal supraventricular tachycardia and short PR interval consistent with accelerated AV

23 conduction.  AR 176.  Plaintiff was referred to Dr. Peter Nalos for an electrophysiological study.

24 AR 176.

25    On July 17, 2002, Plaintiff sought follow-up treatment at Clinica Sierra Vista for

26 palpitations.  AR 181.  Plaintiff was referred to a cardiologist.  AR 181.

27    On September 9, 2002, state agency physician Clair Steggall, M.D., completed a

28 Psychiatric Review Technique form.  AR 197-209.  Dr. Steggall opined that Plaintiff had an

anxiety-related disorder that did not precisely satisfy the diagnostic criteria.  AR 197, 202.  Dr. Steggall concluded that the impairment was severe but not expected to last 12 months.  AR 197. Dr. Steggall further opined that Plaintiff had mild difficulties in maintaining social functioning and mild difficulties in maintaining concentration, persistence or pace.  AR 207.  She had no restriction of her activities of daily living.  AR 207.  On September 10, 2002, psychiatrist Marina C. Vea, M.D., signed the Psychiatric Review Technique form.  AT 197.  On December 31, 2002, Elpidio Fonte, M.D., reviewed and affirmed the assessment as written.  AR 197.

On September 9, 2002, Dr. Steggall also completed a Physical Residual Functional Capacity Assessment form.  AR 210-217.  Dr. Steggall opined that Plaintiff could lift and/or carry 20 pounds occasionally, 10 pounds frequently, could stand and/or walk about 6 hours in an 8-hour workday, could sit about 6 hours in an 8-hour workday and could push and/or pull without limitation other than as shown for lift and/or carry.  AR 211.  She had no postural, visual communicative or environmental limitations.  AR 212-214.  She had limited handling (gross manipulation) with limited frequent forceful grasping.  AR 213.  On December 31, 2002, Dr. Fonte reviewed and affirmed the assessment as written.  AR 216.

On September 18, 2002, Plaintiff complained of chest pains and sought a referral to a cardiologist.  AR 190.  On September 19, 2002, Plaintiff spoke with Dr. de Barros regarding migrating chest pain.  AR 190.  Plaintiff reportedly insisted on a cardiology consult and Dr. de Barros asked Plaintiff to try Prevpac.  AR 190.

On September 24, 2002, Plaintiff spoke with Dr. de Barros regarding complaints of lightheadedness at the end of the day.  AR 189.  Dr. de Barros opined that Plaintiff was waiting long periods of time to eat after taking medications.  AR 189.

On October 21, 2002, Plaintiff saw Dr. de Barros for follow-up of pain and palpitations. AR 188.  She was encouraged to try Vioxx for her costochondritis.  AR 188.

On February 24, 2003, Plaintiff sought treatment from Dr. de Barros for complaints of back pain and anxiety attacks.  AR 228.  Plaintiff reported falling out of her door onto her right buttock two weeks prior to the visit.  AR 228.  She had thoracic back pain and pain in her low back and buttocks.  AR 228.  She also reported having anxiety attacks.  AR 228.  Dr. de Barros

1  diagnosed Plaintiff with thoracic and lumbar back strain.  AR 228.  She was prescribed Darvocet

2  and Flexeril.  AR 228.  Dr. de Barros also assessed Plaintiff with anxiety and palpitations.  AR

3  228.  She was prescribed Lorazepam for her anxiety.  AR 228.

4      On February 26, 2003, Plaintiff requested a note to be excused from a workshop.  AR

5  226.  She reported taking five different medications, but still having back pain.  AR 226.

6      On May 13, 2003, Plaintiff saw Dr. de Barros for complaints of back pain and chest pain.

7  AR 225.  Plaintiff also complained that her left arm was sore and numb.  AR 225.  Dr. de Barros

8  diagnosed myofascial pain and prescribed Flexeril, Darvocet and other medication.  AR 225.

9      On October 10, 2003, Dr. de Barros completed a questionnaire regarding Plaintiff's

10 medical problems.  AR 242.  Dr. de Barros opined that Plaintiff's medical problems did not

11 preclude her from performing full-time work at any exertional level, including the sedentary

12 level.  AR 242.  Dr. de Barros further opined that the combination of Plaintiff's impairments

13 restricted her to doing no more than sedentary work, which was defined as lifting no more than

14 10 pounds, sitting for 6 hours in an 8-hour work day, and standing/walking for 2 hours in an 8-

15 hour work day.  AR 242.  Dr. de Barros identified Plaintiff's primary impairments as chronic

16 back pain and thumb tendonitis.  AR 242.  Dr. de Barros concluded that Plaintiff could sit 2-4

17 hours, stand 1 hour and walk 1 hour in an 8-hour work day.  AR 242.  She did not need to lie

18 down or elevate her legs, but she should not lift more than 10 pounds and should not have to

19 reach below waist level, crouch or bend.  AR 242.  Dr. de Barros opined that Plaintiff had been

20 disabled to this degree since May 13, 2003.  AR 242.

21     On November 17, 2003, Dr. Tam completed a cardiovascular evaluation of Plaintiff.  AR

22 229-231.  Plaintiff complained of tiring easily, intermittent palpitations and shortness of breath.

23 AR 229.  Following examination, Dr. Tam opined that Plaintiff had exogenous obesity and

24 occasional ventricular premature complexes.  AR 231.  Dr. Tam indicated that Plaintiff was

25 being followed by Dr. Peter Nalos, an electrophysiologist, who placed Plaintiff on Flecanide and

26 Metoprolol.  AR 231.  Dr. Tam indicated that the medications appeared to be controlling her

27 arrhythmia.  AR 231.  Dr. Tam further opined that Plaintiff had no physical disability and he did

28 not see any reason why she could not be gainfully employed on a physical basis.  AR 231.

1    On November 17, 2003, Dr. Tam completed a Medical Source Statement of Ability To

2    Do Work-Related Activities (Physical) form.  AR 232-235.  Dr. Tam opined that Plaintiff could

3    lift and/or carry 25 pounds occasionally and 20 pounds frequently.  AR 232.  Her standing,

4    walking, sitting, pushing and pulling were not affected by her impairment.  AR 232-233.  She

5    frequently could climb, balance, kneel, crouch, crawl and stoop.  AR 233.  She had unlimited

6    reaching, handling, fingering and feeling.  AR 234.  She did not have visual, communicative or

7    environmental limitations.  AR 234-235.  Dr. Tam opined that Plaintiff was not disabled.  AR

8    235.

9    On November 17, 2003, Dr. Tam also completed a Medical Source-Vendor Questions

10   form at the request of the ALJ.  AR 236.  Dr. Tam opined that Plaintiff was not disabled

11   physically.  AR 236.

12   On November 17, 2003, licensed psychologist Kimball Hawkins, Ph.D., completed a

13   consultative psychological evaluation of Plaintiff.  AR 237-241.  On mental status exam, Plaintiff

14   was oriented to person, place and time.  AR 238.  She reported some depressive symptoms and

15   was agitated easily.  AR 238.  She demonstrated a labile mood and sad affect.  AR 238.  She

16   cried easily.  AR 238.  She was defensive, angry and appeared unhappy throughout the

17   assessment.  AR 238.  Results of the Wechsler Adult Intelligence Scale-III yielded scores in the

18   low borderline deficit range.  AR 239.  Results of the Wechsler Memory Scale-III yielded scores

19   in the borderline to mild deficit range.  AR 240.

20   Dr. Hawkins noted that Plaintiff demonstrated symptoms of a mood disorder and a

21   history of alcohol abuse.  AR 240.  Dr. Hawkins recommended that she receive ongoing

22   psychiatric treatment, counseling and medical follow-up.  AR 240.  Dr. Hawkins considered her

23   ability to understand, remember and carry out complex instructions to be poor.  AR 240.  Her

24   ability to understand, remember and carry out simple instructions was good.  AR 240.  Her ability

25   to maintain concentration, attention and persistence was marginal.  AR 240.  Her ability to

26   perform activities within a schedule and maintain regular attendance was fair.  AR 240-241.  Her

27   ability to complete a normal work day and week without interruptions from psychologically

28   based symptoms was poor because of avoidance, agitation and anxiety.  AR 241.  Her ability to

respond appropriately to changes in a work setting was considered to be marginal.  AR 241.  Her ability to manage her own finances was considered to be fair.  AR 241.  Dr. Hawkins diagnosed her with a history of anxiety disorder not otherwise specified, mood disorder not otherwise specified and alcohol abuse in reported remission.  AR 241.

On June 1, 2004, Plaintiff sought treatment for stomach problems, thumb pain, spots on her back and palpitations.  AR 266.  She was assessed with GI upset, tendonitis, tinea corporis, and palpitations.  AR 266.  She was prescribed medications.  AR 266.

On July 17, 2004, Plaintiff sought treatment for shoulder strain, depression/anxiety, urinary frequency and abdominal pain.  AR 265.  Plaintiff reported that her abdominal/gas pain and her tendonitis were better with medications.  AR 265.  Her neck and scapular pain were better overall.  AR 265.

On July 29, 2004, Plaintiff called Dr. de Barros to report that ibuprofen was causing nausea and not helping her pain.  AR 263.  Plaintiff requested Darvocet, which was approved by Dr. de Barros.  AR 263.

On August 24, 2004, Plaintiff sought treatment for occasional stomach discomfort and episodic left great toe numbness.  AR 258.  Plaintiff was assessed with occasional abdomen pain and left toe numbness.  AR 258.  For her abdominal pain, she was advised to discontinue spicy and greasy food and caffeine.  AR 258.  For her toe, she was to avoid prolonged sitting.  AR 258.

On October 1, 2004, Plaintiff sought treatment for an ankle sprain.  AR 255.  She was referred for a left ankle x-ray.  AR 255, 256.   Plaintiff also reported starting "PT," with decreased back pain.  AR 255.

On January 6, 2005, Plaintiff sought a note from Dr. de Barros indicating that she could not lift more than 25 pounds.  AR 253.  Plaintiff reportedly was "locked up" and would be released the following day.  AR 253.

On February 2, 2005, Plaintiff sought treatment for complaints of a bump on her inner thigh and back pain.  AR 252.  She was assessed with a boil and back pain and was prescribed an ibuprofen refill and other medication.  AR 252.  The provider noted that Plaintiff had a PT appointment pending.  AR 252.

1    On February 3, 2005, Plaintiff wanted a note from Dr. de Barros for work.  AR 251.  Dr.

2  de Barros wrote a note for work through February 7, 2005.  AR 251.

3    On March 3, 2005, Plaintiff sought treatment from Dr. de Barros for a left shoulder

4  injury.  AR 251.  Plaintiff also complained of increased back pain with the work release program.

5  AR 251.  Dr. de Barros assessed her with left shoulder pain and prescribed ibuprofen.  AR 251.

6  She also was given a note for light duty or postponement of work release until "PT done."  AR

7  251.  X-rays of Plaintiff's shoulder taken on March 8, 2005, were normal.  AR 249.

8    On March 10, 2005, Plaintiff reported that her PT authorization had expired.  AR 248.

9  On March 25, 2005, she sought another authorization for PT and reported that she had not been

10 seen since September.  AR 246.

11    On March 29, 2005, Plaintiff saw Dr. de Barros for GERD and shoulder pain.  AR 245.

12 She was given a note for work.  AR 245.

13    On March 30, 2005, Plaintiff was authorized through Kern Family Health Care for "PT 3

14 x w x 3," beginning February 1, 2005.  AR 268.  She was referred by Dr. de Barros for chronic

15 left shoulder and neck pain.  AR 268.  Dr. de Barros indicated that Plaintiff could not perform

16 work functions and she had been on ibuprofen/flexeril for 6 months.  AR 268.

17                    ALJ's Findings

18    As an initial matter, the ALJ consolidated Plaintiff's first application for SSI and

19 Disability Insurance Benefits with her subsequent application for SSI.  AR 16.  Although the ALJ

20 determined that Plaintiff met the requirements for a period of disability and Disability Insurance

21 Benefits and was insured for benefits through March 31, 2002, the ALJ's findings indicated that

22 Plaintiff was insured through the date of the decision.  AR 16, 22.  The ALJ found that Plaintiff

23 had not engaged in substantial gainful activity since the alleged onset of disability.  AR 22.  Her

24 chronic back pain, borderline intellectual functioning and generalized anxiety were considered

25 "severe," but they did not meet or medically equal one of the listed impairments in Appendix 1,

26 Subpart P, Regulation No. 4.  AR 22.  The ALJ also found that Plaintiff's allegations regarding

27 her limitations were not totally credible.  AR 20-21, 22.  The ALJ determined that Plaintiff

28 retained the residual functional capacity ("RFC") to lift 20 pounds occasionally and carry 10

1    pounds frequently.  AR 22.  She could stand, walk and sit for up to six hours each in an eight-
2    hour workday.  AR 22.  She was limited mentally to simple, repetitive tasks.  AR 22.  She was
3    restricted mildly in her activities of daily living, limited mildly in her ability to maintain social
4    functioning and limited moderately in her ability to maintain concentration, persistence and pace.
5    AR 22.  The ALJ concluded that Plaintiff's impairments precluded her from performing any of
6    her past relevant work, but she could perform a significant range of unskilled light work.  AR 22-
7    23.  Although Plaintiff could not perform the full range of light work, the ALJ used Medical-
8    Vocational Rules 202.18 and 202.21 as a framework to determine that Plaintiff was not under a
9    "disability."  AR 23.

10                                          **SCOPE OF REVIEW**

11           Congress has provided a limited scope of judicial review of the Commissioner's decision
12   to deny benefits under the Act.  In reviewing findings of fact with respect to such determinations,
13   the Court must determine whether the decision of the Commissioner is supported by substantial
14   evidence.  42 U.S.C. § 405(g).  Substantial evidence means more than a mere scintilla,
15   *Richardson v. Perales*, 402 U.S. 389, 401 (1971), but less than a preponderance.  *Sorenson v.*
16   *Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975).  It is "such relevant evidence as a
17   reasonable mind might accept as adequate to support a conclusion."  *Richardson*, 402 U.S. at 401
18   (internal quotation marks and citation omitted).  The record as a whole must be considered,
19   weighing both the evidence that supports and the evidence that detracts from the Commissioner's
20   conclusion.  *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).  In weighing the evidence and
21   making findings, the Commissioner must apply the proper legal standards.  *E.g.*, *Burkhart v.*
22   *Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).  This Court must uphold the Commissioner's
23   determination that the claimant is not disabled if the Commissioner applied the correct legal
24   standards and if the Commissioner's findings are supported by substantial evidence.  *See Sanchez*
25   *v. Sec'y of Health and Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

26                                              **REVIEW**

27           In order to qualify for benefits, a claimant must establish that she is unable to engage in
28   substantial gainful activity due to a medically determinable physical or mental impairment that

has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c (a)(3)(A).  A claimant must show that she has a physical or mental impairment of such severity that she is not only unable to do her previous work, but cannot, considering her age, education, and work experience, engage in any other kind of substantial gainful work that exists in the national economy. *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989).  The burden is on the claimant to establish disability. *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990).

In an effort to achieve uniformity of decisions, the Commissioner has promulgated regulations which contain, inter alia, a five-step sequential disability evaluation process. 20 C.F.R. § § 404.1520(a)-(g), 416.920 (a)-(g) (2005).  Applying the evaluation process in this case, the ALJ found that Plaintiff (1) has not engaged in substantial gainful activity since the alleged onset of disability; (2) has an impairment or a combination of impairments that is considered "severe" (chronic back pain, borderline intellectual functioning and generalized anxiety) based on the requirements in the Regulations (20 C.F.R. § 416.920(c) (2005)); (3) does not have an impairment or combination of impairments that meets or equals one of the impairments set forth in Appendix 1 to Subpart P of Part 404; (4) does not have the residual functional capacity to perform her past relevant work; but (5) can perform a significant range of unskilled light work. AR 22-23.

Here, Plaintiff contends that (1) the ALJ improperly rejected the opinions of her examining physician and (2) the ALJ failed to adduce testimony from the VE regarding Plaintiff's residual capacity for work.

## DISCUSSION

A.      Opinion of Examining Physician

Plaintiff asserts that the ALJ improperly rejected the opinion of Kimball Hawkins, Ph.D., the consultative psychological examiner.  The opinion of an examining physician is entitled to greater weight than the opinion of a nonexamining physician. *Pitzer v. Sullivan*, 908 F.2d 502, 506 n.4 (9th Cir.1990); *Gallant v. Heckler*, 753 F.2d 1450 (9th Cir.1984).  The Commissioner must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of an

examining physician. *Pitzer*, 908 F.2d at 506. Even if contradicted by another doctor, the opinion of an examining doctor can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record. *Andrews v. Shalala*, 53 F.3d 1035, 1043 (9th Cir.1995).

Here, Plaintiff argues the ALJ's rejection of Dr. Hawkins' opinion regarding her poor ability to complete a normal workday or work week is unsupported by the record. The ALJ initially gave "less weight" to Dr. Hawkins' assessment of Plaintiff having a poor ability to complete a normal workday or work week because Plaintiff had "worked often in the past, even with her borderline intelligence and anxiety."[5] AR 19. Contrary to the ALJ's finding, Dr. Hawkins' limitations were not based on Plaintiff's borderline intelligence or on her anxiety alone. Instead, Dr. Hawkins opined that Plaintiff's ability to complete a normal work day and week without interruptions from psychologically based symptoms was poor "because of avoidance, agitation and anxiety." AR 241. Dr. Hawkins based his determination on observations of Plaintiff and a mental status exam. On mental status exam, Plaintiff was defensive, angry and frequently appeared agitated. AR 238. *Tonapetyan v. Haler*, 242 F.3d 1144, 1149 (9th Cir. 2001) (consultive examiner's opinion may constitute substantial evidence because it is based on examiner's independent findings and observations). Further, the ALJ's reasoning that Plaintiff worked in the past does not mean that she currently would be able to complete a normal workday or week without interruption from psychologically based symptoms.

Next, the ALJ rejected Dr. Hawkins' assessment of Plaintiff's poor ability to complete a work day and week because she reported to a mental health therapist in 2001 that she voluntarily quit a hospital training program when her friend's grandmother died in the same hospital. AR 19. The ALJ concluded that Plaintiff did not leave the training because she could not do the work or because of physical or psychological symptoms. AR 19. However, the record indicates that Plaintiff reported to a marriage and family therapist that the death of her friend's

---

[5]Plaintiff also asserts the ALJ incorrectly inferred that Plaintiff had "been suffering from the same degree of anxiety disorder even during her years of employment." Plaintiff's Opening Brief, p. 5. Plaintiff's assertion is unsupported. Although the ALJ acknowledged Plaintiff's history of anxiety during her time of employment, he also found Plaintiff's anxiety to be a severe impairment. AR 22. In addition, the ALJ considered Plaintiff's seven-year history of anxiety without mental health counseling, group therapy or psychiatric treatment. AR 20-21.

1   grandmother in the hospital where she worked (Code Blue called) "upset her" and she did not go

2   back to the training program.  AR 167.  The ALJ does not articulate his reasoning regarding how

3   her leaving was unrelated to her anxiety disorder or possible psychological symptoms.  The

4   record reveals that Plaintiff also reported she was unable to adjust to normal life stressors, such

5   as a death in the family, which would cause her to get shaky and not be able to "come down."

6   AR 169.  Further, following the mental status exam and assessment, the marriage and family

7   therapist diagnosed Plaintiff with generalized anxiety disorder and opined that Plaintiff had

8   severe impairments in community participation and physical and emotional health.  AR 168.

9       Plaintiff also argues that the ALJ improperly rejected Dr. Hawkins' opinion that Plaintiff

10  had a marginal ability to maintain concentration, attention and pace.  The ALJ rejected that

11  portion of Dr. Hawkins' opinion because "such a limitation is consistent with the performance of

12  simple, repetitive tasks."  AR 20.  This conclusion is unsupported by the record before the Court.

13  Plaintiff's ability to perform routine, simple tasks does not mean that she has the ability to

14  concentrate at work or maintain attention and pace.  *Cf. Newton v. Chater*, 92 F.3d 688, 695 (8th

15  Cir.1996) (deficiencies of concentration, persistence or pace resulting in failure to complete tasks

16  in a timely manner was not adequately presented in hypothetical limiting the claimant to simple

17  jobs).

18      Based on the foregoing, the ALJ's reasons for rejecting the opinion of the examining

19  physician were unsupported by the record.  The ALJ's decision to accept the limitations imposed

20  by the non-examining state agency medical consultants and his own assessment of Plaintiff's

21  limitations over the examiner's opinion do not constitute substantial evidence.  *Pitzer,* 908 F.2d

22  at 506 n. 4 (the opinion of a non-examining physician cannot by itself constitute substantial

23  evidence that justifies the rejection of the opinion of either an examining physician *or* a treating

24  physician).  Accordingly, remand is appropriate to allow the ALJ to consider the opinion of the

25  examining psychologist, Dr. Hawkins.

26      To the extent that Dr. Hawkins' opinion may be contradicted by the State Agency medical

27  consultants, the ALJ may not reject Dr. Hawkins' opinion without providing "specific and

28  legitimate reasons" supported by substantial evidence in the record.  If there is "substantial

1    evidence" in the record contradicting the opinion of the examining physician, the ALJ is

2    instructed by Sections 404.1527 and 416.927 to consider the factors listed in Sections

3    404.1527(d) and 416.927(d) in determining what weight to accord the examining physician's

4    opinion on remand.  20 C.F.R. §§ 404.1527 and 416.927 (2005).

5    B.    Vocational Expert Testimony

6           Plaintiff contends that the ALJ erred by failing adduce testimony from the vocational

7    expert regarding Plaintiff's non-exertional mental limitations.  To support her contention,

8    Plaintiff argues that although the ALJ found Plaintiff to have moderate limitations in the ability

9    to maintain concentration, persistence and pace, the ALJ improperly relied on grid rules 202.18

10    and 202.21 to find her disabled.[6]  In general, where a claimant suffers only from exertional

11    limitations, the ALJ may apply the Grids at step five to match the claimant with the appropriate

12    work.  _Reddick v. Chater_, 157 F.3d 715, 729 (9th Cir. 1998).  The ALJ may apply the Grids in

13    lieu of taking VE testimony only when the Grids accurately and completely describe the

14    claimant's abilities and limitations.  _Id._ (citing _Jones v. Heckler_, 760 F.2d 993, 995 (9th Cir.

15    1985)).  If a claimant's non-exertional limitations "significantly limit the range of work" she can

16    perform, mechanical application of the grids is inappropriate and a vocational expert would be

17    needed to describe what, if any, jobs existed in the national economy that the claimant could

18    perform.  _Desrosiers v. Secretary of Housing and Health Services_, 846 F.2d 573, 577 (9th Cir.

19    1988).  The determination of whether a non-exertional limitation significantly limits the range of

20    work the claimant is able to perform is left to the ALJ.  _Id._  Here, the ALJ determined that

21    Plaintiff's mental impairment would not preclude her from performing a significant range of

22    unskilled light work.  AR 22-23.  As previously indicated, however, the ALJ improperly rejected

23    the non-exertional mental limitations imposed by Dr. Hawkins.  Accordingly, once Dr. Hawkins'

24

25

26           [6]Plaintiff also contends that a moderate limitation is deemed to be severe and a severe impairment causes a

27    significant limitation.  To the extent that Plaintiff equates a severity determination with a determination of residual functional capacity and ability to perform work in the national economy, Plaintiff's argument is misplaced.  The determination of an impairment's severity is a step two analysis distinct from the assessment of a claimant's residual

28    functional capacity and ability to perform work in the national economy at step five of the sequential evaluation process.  20 C.F.R.§ 416.920a(c), (d) (2005); _Smolen v. Chater_, 80 F.3d 1273, 1289-1290 (9th Cir. 1996).

1  opinion is considered on remand, it may be appropriate to obtain testimony from a vocational

2  expert regarding Plaintiff's non-exertional mental limitations.

3  **CONCLUSION**

4        Based on the foregoing, the Court finds that the ALJ's decision is not supported by

5  substantial evidence and is therefore REVERSED and the case is REMANDED to the ALJ for

6  further proceedings consistent with this opinion.  The Clerk of this Court is DIRECTED to enter

7  judgment in favor of Plaintiff Nikki Russell and against Defendant Michael J. Astrue,

8  Commissioner of Social Security.

9

10  IT IS SO ORDERED.

11  **Dated:      October 16, 2007                    /s/ John M. Dixon**
                                    UNITED STATES MAGISTRATE JUDGE

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28